No. 24-2910
_____

## IN THE UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

_____

SUSAN VANNESS, ALEXANDREA SLACK, MARTIN WALDMAN,
ROBERT BEADLES,

*Plaintiff-Appellants*,

v.

FRANCISCO V. AGUILAR, in his official capacity as Nevada Secretary of
State, JOSEPH M. LOMBARDO, in his official capacity as Governor
of the State of Nevada,
*Defendants-Respondents*

On Appeal from the United States District Court
for the District of Nevada
No. 2:23-cv-01009-CDS-MDC
Hon: Christina Silva

_____

## APPELLANTS' OPENING BRIEF

_____

Sigal Chattah, Esq.
CHATTAH LAW GROUP
5875 S. Rainbow Blvd #204
Las Vegas, Nevada 89118
Tel: (702) 360-6200
Chattahlaw@gmail.com
*Attorney for Appellants*

## CORPORATE DISCLOSURE STATEMENT

There are no corporations involved in this case.

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ................................................................... i

TABLE OF AUTHORITIES……………………………………………...iii-iv

INTRODUCTION ................................................................................... 1-2

JURISDICTIONAL STATEMENT ...................................................... 2-3

ISSUE(S) PRESENTED……………………………………………………3

STATEMENT OF THE CASE…………………………………………….4-6

STANDARD OF REVIEW………………………………………….........6

LEGAL ARGUMENT........................................................................... 6-23

     I.      APPELLANTS HAVE ARTICLE III STANDING ALLEGING A CONCRETE HARM.

     II.    THE DISTRICT COURT ERRED IN HOLDING THAT APPELLANTS FAILED TO MEET THE STANDARD FOR AN INJURY OF FACT

CONCLUSION.........................................................................................23

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF CASES AND AUTHORITIES

<u>**FEDERAL CASES**</u>                                                    <u>**PAGE NO.**</u>

*Am. C.L. Union of Nevada v. Lomax*, 471 F.3d 1010 (9th Cir. 2006)        15

*Banks v. N. Tr. Corp.*, 929 F.3d 1046 (9th Cir. 2019)                    6

*Bishop Paiute Tribe v. Inyo Cnty.*, 863 F.3d 1144 (9th Cir. 2017)        16

*Bonnichsen v. United States,* 367 F.3d 864 (9th Cir. 2004)              15

*Broadrick v. Oklahoma*, 413 U.S. 601(1973)                              13

*Clark v. City of Seattle*, 899 F.3d 802 (9th Cir. 2018)                 16

*Chandler v. State Farm Mut. Auto. Ins.,* 598 F.3d 1115
(9th Cir. 2010)                                                          6

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)                      9

*Friends of the Earth, Inc. v. Laidlaw Entl. Servs. (TOC) Inc.*          6
528 U.S. 167 (2000)

*Food and Drug Administration v. Alliance for Hippocratic Medicine*,     8
No. 23-10362 (5th Cir. 2023)

*Jones v. Ford Motor Co.*, 85 F.4th 570 (9th Cir. 2023).                 6

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130 (1992)        6-8,15

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139, 130 S.Ct. 2743 (2010)                                     7

*Parsons v. U.S. Dep't of Justice,* 801 F.3d 701 (6th Cir. 2015)        20

*Phillips v. DeWine,* 841 F.3d 405 (6th Cir. 2016)                       20

*Reno v. American Civil Liberties Union*, 521 U.S 844 (1997)          13

*Spokeo, Inc v. Robins*, 578 U.S. 330 (2016)          7, 14

*Summers v. Earth Island Institute*, 555 U. S. 488 (2009)          8

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)          16, 20

*Tibbetts v. DeWine,* 138 S. Ct. 301 (2017)          20

*Transunion LLC v. Ramirez* 951 F. 3d 1008 (1976)          8

*Tucson v. City of Seattle*, No 23-35549, (9th. Cir 2024)          13

*United States v. Hansen*, 599 U.S. 762 (2023)          21

*United States v. Stevens*, 559 U.S. 460 (2010)          12

*United States v. Williams,* 553 U.S. 285 (2008)          13, 22

*Vasquez v. Los Angeles Cnty.*, 487 F.3d 1246 (9th Cir. 2007)          6

*Wakefield v. ViSalus, Inc.*, 51 F.4th 1109 (9th Cir. 2022)          6

*Washington Env't Council v. Bellon*, 732 F.3d 1131 (9th Cir. 2013)          6

**STATUTES**

A.    42 U.S.C. §1983

B.    U.S. Const. Amends. I, V, XIV

C.    SB 406

D.    NRS 293.274

## INTRODUCTION

Appellants appeal dismissal of their facial challenge to the constitutionality of Nevada's SB 406 which provides in pertinent part:

"[C]hapter 293 of NRS is hereby amended by adding thereto a new section to read as follows:

1.   It is unlawful for any person to use or threaten or attempt to use any force, intimidation, coercion, violence, restraint or undue influence **with the intent** to:
(a)  **Interfere with the performance of the duties** of any **elections official** relating to an election; or
(b)  Retaliate against any **elections official** for performing duties relating to an election.
2.   The provisions of subsection 1 apply **_regardless of whether_** a person uses or threatens or **_attempts to use_** such force, intimidation, coercion, violence, restraint or undue influence **_at a polling place or a location_** other than a polling place.
[*Emphasis added*]

All four Appellants/Plaintiffs are former poll/election workers and poll watchers who filed the instant case, complaining that SB 406 is: (1) overbroad in violation of the First Amendment of the U.S. Constitution; (2) vague in violation of substantive due process under the Fourteen Amendment of the U.S. Constitution; and (3) vague and overbroad in violation of Article 1, section 1 of the Nevada Constitution.

While SB406 masks as an act to protect elections officials, the residual effect of the act threatens democratic participation by deterring individuals from engaging in lawful monitoring and oversight of elections in Nevada.

The District Court's analysis of whether Appellants have standing to bring the following action was clearly erroneous. The District Court's dismissal of the matter was based on lack of Article III standing and did not delve into an analysis of whether the action is precluded under the Eleventh Amendment or whether Appellants failed to state a claim upon which relief could be granted under Fed. R. Civ. Pro. 12(b)(6).

Accordingly, the foregoing Appeal is specifically limited to the issue of whether Appellants demonstrated sufficient facts in support of Article III standing to bring the matter *sub judice*.

## JURISDICTIONAL STATEMENT

This matter is on appeal from the April 8, 2024, Order of the District Court for the District of Nevada, in which the District Court dismissed Appellants' Second Amended Complaint (hereinafter SAC) with prejudice entering judgment thereon on the same day [ER-006-014].

Plaintiff-Appellants filed a Notice of Appeal on May 2, 2024, and thereafter obtained a streamlined extension of time on June 10, 2024, to file this Opening Brief on or before July 17, 2024.

The District Court had subject matter jurisdiction under the Constitution of the United States, and under 28 U.S.C. §§ 1331,1367(a), and 42 U.S.C. § 1983 to grant the requested relief. The Ninth Circuit Court has appellate jurisdiction under

28 U.S.C. §§ 1291and 1292 to reverse the District Court's dismissal and reinstate Appellants' SAC and allow proceedings to be litigated on the merits thereof.

## ISSUE(S) PRESENTED

The following issues are presented in this appeal:

1. Whether the District Court erred in dismissing the SAC entering Judgment thereon, finding Appellants lack standing to proceed on their facial challenge of SB 406.

2. Whether Appellants alleged a credible threat of prosecution under SB406 and thus sufficient injury-in-fact to sustain a finding that Appellants indeed have Article III standing to support their claims

## STATEMENT OF THE CASE

On or about May 30, 2023, after passing both chambers of the Nevada Legislature, Nevada's Secretary of State Francisco V. Aguilar and Nevada's Governor Joseph M. Lombardo signed SB 406 into law.

SB 406 is described as "AN ACT relating to elections; making it unlawful for a person to use or threaten or attempt to use any force, intimidation, coercion, violence, restraint or undue influence with the intent to interfere with the performance of duties of an elections' official or retaliate against an elections official for the performance of such duties;"

3

Sections 1 and 2 of SB 406 impose impossible—and unpredictable— burdens on individuals that come into contact with "election officials" during elections at voting centers and ballot processing centers.

The consequence of said sections in SB 406 is a sweeping and unwieldy regulation that leaves the identification of what an offense is, so opaque, uncertain, and all-encompassing that the four Appellants and others similarly situated cannot determine whether and when the most basic poll/election observation activities undertaken will subject them to drastic criminal penalties.

The statute's failure to precisely define the identification of a protected class or what victim is to be covered by said sections in SB 406 leaves the legislation so opaque and uncertain, that Appellants and others similarly situation cannot determine who an election official is and who is protected under SB 406.

As Appellants alleged in their SAC, SB 406 subjects them to criminal liability without defining what intimidation and/or undue influence with the intent to interfere is for said crime. [ER-077; 6-9]. As delineated below, Appellants' fear of being prosecuted for crimes under SB 406 has already affected their willingness to participate as poll workers and poll watchers.

Past threats of prosecution made against poll watchers, by Nevada's Attorney General, before SB 406 was even passed, easily qualify as threats of

enforcement on a subjective basis and could lead to arbitrary and/or discriminatory enforcement of said Legislation.

Seemingly, the purpose of the Legislation seeks to undermine the good faith intent of individuals observing and watching that Nevada's elections are transparent, safe and secure. The unpredictability of how SB406 will be applied burdens these individuals that come in contact with elections officials during elections with the possibility of being charged with a class E felony for objecting to an election official's behavior that may or may not be deemed as harassment with an intent to interfere with the election as promulgated in the statutory provision.

Furthermore, SB 406 provides no "guardrails" or classification for immunity or exemption for "election officials' or election observers as defined under NRS 293.274 [*and/or supervisors*] whom are paid to ensure election oversight, management and transparency among themselves.

It is significant to note, that there are already laws in place that deal with harassment, intimidation and coercion, as alleged in Plaintiffs SAC [ER-071; 8-12].

Appellants' SAC delineates the following Claims for Relief:

First Claim for Relief: Violation of the First Amendment
Free Speech Clause        (Overbreadth)

Second Claim for Relief: Violation of the Fourteenth Amendment-Substantive Due Process (Vagueness)

Third Claim for Relief: Violation of Nevada Constitution Article I Declaration of Rights.

## STANDARD OF REVIEW

Dismissal for lack of standing is reviewed de novo. *Jones v. Ford Motor Co., 85 F.4th 570,* 573 (9th Cir. 2023*).Wakefield v. ViSalus, Inc*., 51 F.4th 1109, 1117 (9th Cir. 2022). *Banks v. N. Tr. Corp*., 929 F.3d 1046, 1049 (9th Cir. 2019); *Vasquez v. Los Angeles Cnty*., 487 F.3d 1246, 1249 (9th Cir. 2007).

## LEGAL ARGUMENT

**I.    APPELLANTS ALLEGED A CONCRETE HARM SUFFICIENT TO WITHSTAND AN ARTICLE III CHALLENGE TO STANDING**

Article III of the U.S. Constitution authorizes the judiciary to adjudicate only "cases" and "controversies." The doctrine of standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife* , 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Article III's "case or controversy" requirement "limits federal courts' subject matter jurisdiction by requiring, *inter alia*, that plaintiffs have standing.*"* *Chandler v. State Farm Mut. Auto. Ins.,* 598 F.3d 1115, 1121 (9th Cir. 2010).

A plaintiff must demonstrate standing by establishing the "irreducible constitutional minimum" of (1) an injury in fact (2) fairly traceable to the defendant's challenged conduct (3) that is likely to be redressed by a favorable decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation and quotation omitted). A plaintiff shows injury in fact if he has "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

The three well-known "irreducible constitutional minim[a] of standing" are injury-in-fact, causation, and redressability. *Id.* at 560–61, 112 S.Ct. 2130.

A plaintiff bears the burden of demonstrating that her injury-in-fact is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms* , 561 U.S. 139, 149, 130 S.Ct. 2743, 177 L.Ed.2d 461 (2010).

A plaintiff must demonstrate constitutional standing separately for each form of relief requested. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC) Inc.*, 528 U.S. 167, 185, 120 S. Ct. 693, 145 L.Ed.2d 610 (2000).

Under *Monsanto*, Appellants must demonstrate that their injury is specifically tied to the passage of SB 406.

## A.  PLAINTIFFS HAVE STANDING TO PURSUE THE FACIAL CHALLENGE OF SB 406

To establish standing, a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief. *Food and Drug Administration v. Alliance for Hippocratic Medicine,* No. 23-10362 (5th Cir. 2023) citing to *Summers v. Earth Island Institute,* 555 U. S. 488, 493.

By requiring the plaintiff to show an injury in fact, Article III standing screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action. *Id.*

An injury in fact must be "concrete," meaning that it must be real and not abstract. *See Transunion LLC v. Ramirez,* 121 S. Ct. 2190, 951 F. 3d 1008 (2021). The injury also must be particularized; the injury must affect "the plaintiff in a personal and individual way" and not be a generalized grievance. *Lujan,* 504 U. S., at 560, n. 1.

In T*ransunion,* the Court specified that "…a person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm

from occurring, at least so long as the risk of harm is sufficiently imminent and substantial. [*Internal citations omitted*]" *Id.* at 1112. Moreover, the injury must be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013); and when a plaintiff seeks prospective relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury. *Id.,* at 401.

It is clear as alleged by Appellants in their SAC, that they have all previously been poll workers and elections observers and that the passage of SB 406 has a direct impact on their ability to execute their functions as same in upcoming elections.  Further, as Appellants alleged in the SAC, the passage of SB 406 and the fear of prosecution thereunder has already created a chilling effect on their ability to participate in lawful monitoring and oversight of elections.

In their SAC, Appellants specifically alleged that but-for the passage of SB 406, each of them had an intention to engage in poll watching/observing, election day watching/observing [ER-071; 18-19]. Appellants further alleged that they have an imminent fear of engaging in poll watching/election day watching activities because of the threat of subjective prosecution under such a vague statute that fails to identify what the prohibited conduct is. [ER-071; 20-22].

The failure to identify precisely the prohibited conduct inevitably leads to a subjective enforcement precluding SB406 from passing constitutional muster.

9

Appellants also alleged that prior to the passage of this Legislation, that Nevada's Attorney General specifically threatened to prosecute poll watchers as "voter intimidation" [ER-072; 3-5], which the subjectivity of that threat and classification of poll watchers has a chilling effect on Appellants' Constitutional rights.

On or about September 29, 2020, three years before the passage of SB 406, Nevada's Attorney General said he was ready to prosecute anyone attempting voter intimidation in Nevada after President Donald Trump's call during the debate to have his supporters "go into the polls and watch very carefully."

Attorney General Ford, said that he considered the president's [Trump] comments to be a "dog whistle" encouraging voter intimidation, citing the president's past comments suggesting that voters cast both mail and in-person ballots to test the system and his instruction for the right-wing extremist "Proud Boys" group to "stand back and stand by." [ER-0079; 1-21]



**Aaron D. Ford@AaronDFordNV**

Trump also told "his supporters" to "go into the polls and watch very carefully." But he wasn't talking about poll watching. He was talking about voter intimidation. FYI -- voter intimidation is illegal in Nevada. Believe me when I say it: You do it, and you will be prosecuted.

8:51 PM · Sep 29, 2020."[1]

According to Nevada's Attorney General, every individual that was a Trump supporter was instructed to intimidate voters – not poll watch. Nevada's own Attorney General ***unilaterally speculated*** and ***decided*** that a statement to poll watchers to remain vigilant and ensure elections were not tampered with, was a call to intimidate voters and threatened to prosecute poll watchers. This was three years before SB 406 was passed.

Appellants further alleged that a poll taken by the Washoe Republican Party Central Committee members on October 30, 2023, 80% of its membership will no longer engage in poll/elections observing in the 2024 election as a result of fear of prosecution. [ER-072; 6-8].

The lack of "guardrails" or protections in SB406 to engage in lawful conduct of poll watchers in the Legislation is precisely the type of chilling effect that SB 406 creates, preventing Appellants and others, similarly situated, from engaging in lawful and constitutional behavior, due to its subjective criminalization. As demonstrated by the fear instilled in the Central Committee Members for Washoe County, 80% of the membership would rather forfeit engaging in lawful election monitoring and oversight of elections, rather than face

---

[1] https://x.com/AaronDFordNV/status/1311151750829678592?s=20

criminal prosecution under SB 406. Such a result is catastrophic to the very ethos of transparent elections in this Nation.

Further implications of SB 406 impact Appellants on whether they will risk engaging as elections and poll workers and observers in 2024, with the knowledge that such vague legislation may subject them to criminal prosecution. It is significant to note that while Appellants' initial Motion for Preliminary Injunction, facially challenging SB406, was denied as moot following dismissal of the initial Complaint, the merits thereon were not discussed nor was a subsequent Motion brought prior to this Appeal.

In a facial challenge, a plaintiff is claiming that a statute is unconstitutional at all times and under all circumstances. The goal is usually to have a court declare the law "facially invalid". The Supreme Court identified two situations in which a plaintiff might prevail in a facial challenge in *United States v Stevens*, 559 U.S. 460 (2010).

- No set of circumstances exists under which [the statute] would be valid; or

- The statute lacks any 'plainly legitimate sweep"

Facial challenges are common in claims alleging violations of First Amendment rights. The Supreme Court found, for example, that certain provisions of the Communications Decency Act of 1996 were unconstitutional on

their face in *Reno v American Civil Liberties Union*, 521 U.S. 844 (1997). It found that the challenged provisions were both vague and "substantially overbroad". The Court established the "substantial overbreadth" doctrine in *Broadrick v Oklahoma*, 413 U.S 601, 615 (1973).

Explaining how the doctrine applies, the Court stated that "[t]o justify facial invalidation, a law's unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep." *United States v. Williams*, 553 U.S. 285, 292 (2008).

In determining whether an unconstitutional application is realistic, courts may consider whether that application has occurred in the past. See *Williams*, 553 U.S. at 302.

A law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep. *Tucson v City of Seattle*, No 23-35549, (9th. Cir 2024).

While the District Court didn't analyze the merits of Appellants' argument as to the substantive nature of whether the Legislation is overbroad or even passes constitutional muster, for purposes of Article III standing, Appellants, who are directly subjected to this Legislation, have standing to bring a facial challenge, challenging the constitutionality of said Legislation under the principals of overbreadth and vagueness.

**B.   THE COURT ERRED IN HOLDING THAT APPELLANTS FAILED TO MEET THE STANDARD FOR AN INJURY IN FACT.**

The Court erred in its determination that Appellants failed to meet the standard for an injury in fact while citing to *Spokeo, Inc v Robins*, 578 U.S. 330,339 (2016).

In *Spokeo, Inc.*, the Supreme Court found that an injury of fact is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." "To be particularized, an injury "must affect the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). '[A] plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy.' *Lujan*, 504 U.S. at 573-74. To be 'concrete', an injury 'must be '*de facto*'; that is, it must actually exist.' *Id.* At 340. It cannot be abstract or conjectural. *Id.*"

The Court conceded that Appellants were not required to, nor did they allege that they will be prosecuted, but that the fear of prosecution has dissuaded them from working a poll-workers in future. Mistakenly, the Court failed to find that the mere threat of subjective enforcement of the Legislation was sufficient to give Appellants standing.

14

Moreover, the Court ignored the fact of redressability in its analysis on standing. As noted *supra,* for a plaintiff to have Article III standing, there must be a likelihood that a plaintiff's injury will be redressed by a favorable court decision. *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 561 (1992). "The question in deciding whether a plaintiff's injury is redressable is not whether a favorable decision is likely but whether a favorable decision likely will redress a plaintiff's injury." *Bonnichsen v. United States,* 367 F.3d 864, 873 (9th Cir. 2004). Therefore, "redressability analyzes the connection between the alleged injury and requested judicial relief." *Washington Env't Council v. Bellon*, 732 F.3d 1131, 1146 (9th Cir. 2013).

In other words, redressability asks whether "the district court had the power to prevent the injury at the time the complaint was filed." *Am. C.L. Union of Nevada v. Lomax*, 471 F.3d 1010, 1016 (9th Cir. 2006).

Therefore, a proper redressability analysis, had it been conducted, would have determined, that if the Court found that SB406 did not pass constitutional muster and struck the requested parts per Appellants' SAC, Appellants' injury would have been redressed in its entirety. While it was not necessary for the Court to engage in an analysis as to the constitutionality of the Legislation in determining whether Article III standing exists, the Court erred in omitting an

analysis that these particular Appellants' grievance would be redressed with a favorable decision on the constitutionality of SB406.

### 1. The Court Erred in Requiring Appellants Allege a Credible Threat of Prosecution to Sustain Standing, when the Effects of SB 406 Could Not be Triggered Until a Subsequent Election.

It is indisputable that Appellants sought to enjoin enforcement of SB 406 prior to the June, 2024 primary election. Appellants' SAC specifically requested injunctive relief on enforcement of the statute nearly a year before the triggering event of the statute.

This request for injunctive relief was clearly connected to Appellants' alleged injury—i.e., the chilling effect on free exercise of speech for fear of future enforcement of SB 406. *See* B*ellon*, 732 F.3d at 1146 ("[R]edressability analyzes the connection between the alleged injury and requested judicial relief.").

Where Plaintiffs seek judicial intervention before the government has enforced the challenged policy against them, they bear the burden of showing "a credible threat of enforcement." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161 (2014). "[G]eneralized threats of prosecution do not confer constitutional ripeness." *Clark v. City of Seattle*, 899 F.3d 802, 813 (9th Cir. 2018) (quoting *Bishop Paiute Tribe v. Inyo Cnty.*, 863 F.3d 1144, 1154 (9th Cir. 2017)). "Rather, there must be 'a genuine threat of imminent prosecution.'" *Id.*

This Court looks to three factors to determine whether plaintiffs have shown such a credible threat: "[1] whether the plaintiffs have articulated a concrete plan to violate the law in question, [2] whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and [3] the history of past prosecution or enforcement under the challenged statute." *Id.*

**(a) Legal and Actual Impossibility Precluded Appellants from Alleging or Demonstrating Past Prosecution or Enforcement on SB406.**

The most significant detail the Court failed to acknowledge in its analysis of Appellants' standing to challenge SB 406, was that while SB 406 passed in Nevada's Legislature on May 30, 2023, at the time the Decision and Order was entered on April 8, 2024, there had been no elections in the State of Nevada to trigger the enforcement of SB406; or to substantiate for the Court, whether a credible threat of prosecution existed to sustain standing other than the precedent threatened by Nevada's Attorney General in 2020, *supra.*

Furthermore, because this was a new law specifically targeting poll workers and poll watchers for upcoming 2024 elections and thereafter, there had been no history of past prosecution or enforcement of SB406. *Ergo*, how could the Court adequately assess whether a credible threat of prosecution existed for a law that would be enforced for the first time two months after its Decision and Order.

Any insinuation that the Appellants could not prove a credible threat of prosecution on a new law, which was not subject to enforcement until two months

after the Court's decision, was purely speculative of the Court and therefore erroneous.

Whether there was a credible threat of prosecution should not have been a deciding factor in the analysis of the Court, since the newly passed SB 406 was not even ripe for enforcement for two months after the District Court's disposition of this case.

**(b)Appellants Adequately Alleged That Prosecuting Authorities Communicated a Specific Warning or Threat to Initiate Proceedings**

It is clear that since SB 406 could not even be enforced until June 11, 2024[2], long after the SAC was filed on November 2, 2023. Therefore, the only similar threat of prosecution that Appellants could have relied on was threats made against poll watchers in the 2020 election which the Court noted in her decision. *See supra.*

To that effect, Appellants relied on a 2020 public statement by the Nevada Attorney General on or about September 29, 2020; Attorney General Aaron Ford said he was ready to prosecute anyone attempting voter intimidation in Nevada after President Donald Trump's call during the debate to have his supporters "go into the polls and watch very carefully." Ford, said that he considered the

―――――――――――――――――

[2] Notwithstanding Nevada's Presidential Preference Primary held February 6, 2024, that neither the Republican Party of Nevada, nor any of the above Appellants participated in.

president's [Trump] comments to be a "dog whistle" encouraging voter intimidation, citing the president's past comments suggesting that voters cast both mail and in person ballots to test the system and his instruction for the right-wing extremist "Proud Boys" group to "stand back and stand by."[3]

In short, Nevada's Attorney General subjectively conflated the intent of poll watchers to lawfully monitor and oversee elections as "voter intimidation" in 2020 and threatened to prosecute them. Therefore, Appellants correctly relied on threats made by the Attorney General in the most recent Presidential Election Year, preceding the passage of SB 406 which was 2020.

### (c) Plaintiffs Articulated a Concrete Fear of Engaging in Otherwise Protected Speech as a Result of SB 406 Prior to Any Election Triggering Its Enforcement

While the Court noted that Plaintiffs did not articulate a plan to violate the law in question, Plaintiffs instead chose to forfeit any act that may be deemed as violative of SB406 since the regulation on its face is vague and overbroad and does not delineate what is an event that would trigger enforcement.

Furthermore, Appellants correctly predicated their fear on Nevada Attorney General's previous threats to prosecute poll watchers based on his own subjective view of what poll watchers' intent was. Moreover, threatening poll watchers in

---

[3] ER-079; 3-9

2020, based on speculative hyperbole in a tweet, in and of itself, had a chilling effect on Appellants' First Amendment rights to free speech.

"To establish standing for a free-speech claim, the Plaintiffs generally must show that 'the rule, policy or law in question has explicitly prohibited or proscribed conduct on the[ir] part.'" *Phillips v. DeWine,* 841 F.3d 405, 415 (6th Cir. 2016) *(quoting Parsons v. U.S. Dep't of Justice,* 801 F.3d 701, 711 (6th Cir. 2015)), *cert. denied sub nom. Tibbetts v. DeWine,* 138 S. Ct. 301 (2017). Plaintiffs must also show that the "threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *SBA List,* 134 S. Ct. *at* 2341 *(quoting Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 414 n.5 (2013).

The Supreme Court has previously ruled that "[A] plaintiff could bring a pre-enforcement suit when he "has alleged an intention to engage in a course of conduct ***arguably affected*** with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *See SBA List citing to Babbitt, supra, at* 298, 99 S.Ct. 2301.

Here, Appellants allege in their SAC, that the overbreadth and vagueness of SB406 as to who it applies to and under what circumstances it applies in, will prevent them from engaging in the protected speech that follows monitoring and oversight of elections.

The mere threat of enforcing penalties under SB406, had a chilling effect on Appellants' rights to Democratic participation of lawful monitoring and oversight of elections. Appellants' fear of being prosecuted legitimately rested on Attorney General's statements unilaterally and subjectively declaring poll watchers as people engaging in voter interference.

The combination of these acts, all indisputable, sufficiently justified a fear of engaging as poll workers and poll watchers and subjecting themselves to a class E felony in Legislation that was both vague and overbroad. This fear of prosecution under SB406 is precisely the chilling effect that precludes this statutory provision from passing constitutional muster.

**(d) The Court Failed to address that SB 406 Language Could Lead to Arbitrary and Discriminatory Enforcement by Being Overbroad and Vague**

"Overbroad laws 'may deter or "chill" constitutionally protected speech,' and if would-be speakers remain silent, society will lose their contributions to the 'marketplace of ideas. *United States v. Hansen*, 599 U.S. 762, 769 (2023).

In *Hansen*, the Supreme Court further held "[T]o guard against those harms, the overbreadth doctrine allows a litigant . . . to vindicate the rights of the silenced, as well as society's broader interest in hearing them speak." *Id*. at 770. [I]f a challenger demonstrates that the statute 'prohibits a substantial amount of protected speech,' relative to its 'plainly legitimate sweep,' then society's interest

in free expression outweighs its interest in the statute's lawful applications, and a court will hold the law facially invalid." *Id*. (quoting *United States v. Williams,* 553 U.S. 285, 292 (2008).

In their SAC, Appellants specifically delineated combinations of possibilities that SB 406 would subject them to prosecution under the felony portion of the statute. The prohibition of substantial amounts of protected speech, outweighs the purported 'legitimate sweep', precluding SB 406 from passing constitutional muster.

Appellants' SAC included examples such as if a "Rover" confronts a ballot inspector over an inspector's perceived wrongful conduct, with the intent to have that wrongful conduct corrected, and the inspector feels intimidated, under SB 406 that may subject the Rover to criminal liability. This is especially true since SB406, as noted *supra*, has no particular guardrails, exemptions or exceptions to it.

Moreover, if a Ballot Inspector confronts another ballot inspector outside the Central Ballot processing area/Election office/Warehouse, about perceived wrongful conduct, with an intent to correct it, that may subject a ballot inspector to criminal liability for intimidation or undue influence.

The potential pool of innocent individuals, lawfully engaging in election oversight, being subject to criminal liability for attempting to take corrective

22

actions, under the vague and overbroad statutory scheme under SB 406 is inconceivable. [ER-078; 1-11].

Regardless of the Court's failure to address the merits of the facial challenge of SB406 subsequent to an analysis on standing, the failure to at least to engage in a precursory analysis of determination of Article III standing, including redressability was erroneous. Furthermore, the mere threat of enforcement of the SB406, based on previous specific threats by Nevada's Attorney General, when no such law even existed, is sufficient to establish standing for the litigants herein.

As demonstrated by Appellants' contentions in the SAC, SB406 poses a significant threat to democratic participation by deterring Appellants and those similarly situated, from engaging in lawful monitoring and oversight of elections.

## CONCLUSION

For the foregoing reasons, the judgment of the District Court should be reversed, the Second Amended Complaint reinstated, and the case remanded for consideration of Plaintiff-Appellants' claims on the merits.

Dated this 12th day of July, 2024.

*/s/ Sigal Chattah*
Sigal Chattah, Esq.
CHATTAH LAW GROUP
5875 S. Rainbow Blvd #205
Las Vegas, Nevada 89118
Tel: (702) 360-6200
Chattahlaw@gmail.com

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

**9th Cir. Case Number(s) 24-2910**

The undersigned attorney or self-represented party states the following:

[x]  I am unaware of any related cases currently pending in this court.

[ ]  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ]  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature**  _/s/ Sigal Chattah__          **Date** July 12, 2024

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s) 24-2910**

I am the attorney or self-represented party.

**This brief contains 4,888 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[x] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _/s/ Sigal Chattah_____     **Date: July 12, 2024**

## CERTIFICATE OF SERVICE

### Service on Appellees

I certify that a true and correct copy of the **Appellants' Opening Brief and Excerpts of Record** were served electronically on July 12, 2024 to the attorneys of record for Appellees in the district court action at the addresses listed below: